## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HEATHER MYERS,

    *Plaintiff,*

    v.

TOWN OF ELKTON, *et al.*

    *Defendants*

Action No. 22-cv-803-ABA

### MEMORANDUM OPINION

Plaintiff Heather Myers, individually, and in her capacity as the representative of the estate of her late husband, James Myers,[1] alleges that three officers from the Defendant Town of Elkton's police department, Defendant Anthony Devine and Defendant Thomas Saulsbury (the "Officer Defendants"), and Dennis Lasassa,[2] illegally trespassed on the Myers' property and that Officer Devine illegally seized their dog Bella by shooting and killing Bella. Plaintiff alleges that Defendants accordingly violated their constitutional rights, and has asserted claims for damages, including under 42 U.S.C. § 1983. Defendants have moved for summary judgment on all remaining claims not previously dismissed. ECF Nos. 65 & 66. Plaintiff has responded to the motion, ECF No. 70, and the Defendants have replied. ECF Nos. 71 & 74.[3] The Court has considered the parties' briefs and evidence attached thereto and finds that no hearing is

---

[1] Mr. Myers passed away during the pendency of the case.

[2] The Court (Judge Gesner) previously dismissed the claims against Officer Lasassa. ECF No. 52.

[3] Officers Devine and Saulsbury filed one motion and the Town of Elkton filed a separate motion. However, Elkton's motion and reply simply adopt the arguments made by the Officer Defendants.

necessary. Loc. R. 105.6. For the following reasons, the Court will grant in part and deny in part the motions for summary judgment.

## I.   FACTS

Because Defendants have moved for summary judgment, the Court recites the facts in the light most favorable to Plaintiff. *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021).

On April 5, 2019, Officers Devine, Lasassa, and Saulsbury arrested Michael Hindman, husband of Sarah Brown, who is Plaintiff Heather Myers' daughter. Mr. Hindman and Ms. Brown lived with Ms. Myers and Mr. Myers at the Myers' house. After his arrest, Mr. Hindman tried to call his wife, Ms. Brown, but he lacked cell phone reception at the police station. Pl. Opp., Ex. 9 ("Hindman Dep.") at 13:14-22. Mr. Hindman did send Ms. Brown a voice message through Facebook Messenger, however, which she received that day. *Id.* at 13:19-14:22; *id.*, Ex. 8 ("Brown 2022 Dep.) at 19:6-14. The officers offered to go to the Myers' house for a courtesy call, with the avowed purpose of letting Ms. Brown know that Mr. Hindman was arrested and bringing his personal property to her. *Id.*, Hindman Dep. at 14:22-15:5; *id.*, Ex. 4 ("Myers 2022 Dep.") at 161:1-10; *id.*, Ex. 6 ("Devine Dep.") at 46:10-19.

Mr. Hindman agreed, but warned the officers that there were three pit bulls at the house. He stated that the dogs were "not mean" but that they would "be freaking out, wanting to play" if the officers attempted to enter the yard past the latched fence that surrounded the property. *Id.*, Hindman Dep. at 16:4-18. Mr. Hindman told them not to "knock on the door" and that, instead, they should "just shake the fence . . . . The dogs will hear it, they'll bark, somebody's going to come outside." *Id.* Despite the avowed purpose of the visit, the officers did not take any of Mr. Hindman's property to give to Ms. Brown, and Plaintiff contends that doing so would have been

against the Town's policies. Pl. Opp. at 12 (citing Elkton, Maryland, and Cecil County Correctional Facility, *About Cecil County Detention Center*, available at townofelkton.org). *See id.*, Devine Dep. at 48:1-49:21, 66:15-25; *id.*, Myers 2022 Dep. at 161:1-10; *id.*, Brown 2022 Dep. at 19:11-17. Plaintiff also questions why one of the officers did not simply call Ms. Brown to tell her that Mr. Hindman had been arrested, rather than the three officers showing up at her door empty-handed.

At the Myers' house, the officers found the property surrounded by a three- to four-foot chain-link fence with a gate that was latched, but not locked. *Id.*, Brown 2022 Dep. at 39:10-15; *id.*, Devine Dep. at 57:17-22; *id.*, Ex. 7 ("Myers 2023 Dep.") at 98:6-14. They also observed a sign, affixed to the fence gate, that read, "Beware of Guard Dog," "No trespassing," and "Caution." *Id.*, Myers 2022 Dep. at 38:12-40:1; *id.*, Myers 2023 Dep. at 99:2-8; *id.*, Brown 2022 Dep. at 118:3-17; *id.*, Devine Dep. at 57:9-16. Of the three officers, only Officer Saulsbury was wearing his body-worn camera ("bodycam"). *Id.*, Devine Dep. at 40:22-41:12; Mot. at Ex. 2 ("Lasassa Aff.") ¶ 5; Mot. at Ex. 3 ("Saulsbury Aff.") ¶ 5. Neither party has submitted to the Court the bodycam footage of the incident, or the photographs of the scene after the shooting. The evidence is in conflict on whether Officer Devine was in violation of department policy by not wearing his bodycam to the Myers' house. *Compare* Pl. Opp., Devine Dep at 41:13-17 (when asked whether not wearing his bodycam that day violated department policy, responding, "I'd say yes, but I'd have to look at the policy to see exactly what it says.") *with* Mot. Ex. 1 ("Devine Dep.") at 43:3-14 (Q: "Not having the body-worn camera . . . is unquestionably a violation of [the policy], right?" A: "I would not say that. The policy has exceptions in it," "I believe at the time it specified, or left room open to Special Operations, did not always have to have a body camera on."); *see also* Mot., Lasassa Aff. ¶ 5 ("The Police Department does not require us to

wear body cameras when we are on a special assignment like the Area Saturation Patrol."); *id.*, Saulsbury Aff. ¶ 5 ("I also had . . . my body camera, even though department policy does not require that I wear it while on special assignment with the Area Saturation Patrol.").

Instead of heeding Mr. Hindman's warnings or those posted on the latched fence gate, the officers opened the gate and walked into the yard. Officer Devine estimated that the distance between the fence and the front steps of the house was twenty-five feet. Pl. Opp., Devine Dep. at 73:3-12. Officer Devine entered through the gate and into the yard first. Mot., Devine Dep. at 77:6-8; *id.*, Lasassa Aff. ¶ 8; *id.*, Saulsbury Aff. ¶ 8. Officer Saulsbury was second and Officer Lasassa never went through the gate. *Id.*, Lasassa Aff. ¶ 8; *id.*, Saulsbury Aff. ¶ 8.

Mr. Myers opened the front door, and the dogs ran out. According to Ms. Myers, Mr. Myers (who has since passed away) was unaware of the officers' presence when he let the dogs into the yard.[4] Generally, when the dogs wanted to go outside, the Myers family would "[j]ust open the door [and] let them out"—but only if they were not barking. *Id.*, Ex. 5 ("Brown 2023 Dep.") at 40:13-20. If the dogs *were* barking, Ms. Myers testified, the family would not let the dogs out, because that meant someone was in the yard, and they did not want the dogs "to bark at people" or "bombard" the visitors. *Id.* at 41:1-7. There is no evidence in the record that, at the time at issue here, any of the dogs were barking before being let out.

When Mr. Myers opened the door, Officer Devine was about seven feet from the house, *id.*, Devine Dep. at 79:13-16, and Officer Saulsbury was approximately 10 feet from the house, *id.*, Saulsbury Aff. ¶ 9. According to Defendants, Bella was the first of the three dogs out of the house and she ran towards Officer Devine. *Id.*, Devine Dep. at 76:19-22; 79:17-25; 117:24-25;

---

[4] Only the officers and Mr. Myers witnessed the shooting. However, Mr. Myers passed away before his testimony was taken. Ms. Myers was not home, Mot., Myers 2023 Dep. at 58:20-59:4, and Ms. Brown was in the kitchen, Pl. Opp., Brown 2023 Dep. at 13:12-16.

118:4-7; *id.*, Lasassa Aff. ¶ 9; *id.*, Saulsbury Aff. ¶ 9. The second dog ran towards Officer

Saulsbury. *Id.*, Devine Dep. at 117:24-25; *id.*, Lasassa Aff. ¶ 9; *id.*, Saulsbury Aff. ¶ 9. The third

dog ran around the side of the house and ignored the Officers. *Id.*, Devine Dep. at 117:19-22; *id.*,

Lasassa Aff. ¶ 9; *id.*, Saulsbury Aff. ¶ 9. Bella was approximately fifty pounds while the other

two dogs were between forty and fifty pounds. *Id.*, Brown 2023 Dep. at 42:19-43:6.

At this point the officers saw Mr. Myers in the doorway. *Id.*, Devine Dep. at 83:14-20;

*id.*, Lasassa Aff. ¶ 9; *id.*, Saulsbury Aff. ¶ 9. According to the officers, Officer Devine moved

backwards and to his right. *Id.*, Devine Dep. at 80:8-18; *id.*, Lasassa Aff. ¶ 9; *id.*, Saulsbury Aff.

¶ 9. The officers claim the dogs were growling, and biting at them while running towards them,

*Id.*, Devine Dep. at 81:1-6; *id.*, Lasassa Aff. ¶ 16; *id.*, Saulsbury Aff. ¶ 17, but it is undisputed

that no one was bitten, scratched, or injured. Pl. Opp., Devine Dep. at 75:14-22, 81:10, 81:17-

82:20. Officer Devine asserts that Bella got close enough to brush her head against the inside of

his thighs and leave mud stains on his pants. Mot., Devine Dep. at 81:17-25; 92:17-93:9; *see also*

*id.*, Saulsbury Aff. at ¶ 14. Officer Saulsbury managed to get outside the gate, at which time the

second dog joined Bella and focused its attention on Officer Devine. *Id.*, Devine Dep. at 118:1-3,

14; *id.*, Lasassa Aff. ¶¶ 9, 12; *id.*, Saulsbury Aff. ¶¶ 9, 12.

Devine then shot Bella in the head, killing her. *Id.*, Devine Dep. at 108:11-19. The parties

do not dispute that Officer Devine and Bella were close to the fence when he shot her, which as

noted above was between 3 and 4 feet tall. *Id.*, Devine Dep. at 73:13-21 (explaining that he was

against the fence when he shot Bella); *id*. at 81:19-21 (explaining that Bella's head was near his

thigh when he shot her); *id.*, Lasassa Aff. ¶¶11-13 (explaining that Officer Devine was against

the fence and Bella was between his legs when he shot her); *id.*, Saulsbury Aff. ¶ 12-14) (same);

*id.*, Myers 2023 Dep. at 72:22-73:3 (not disputing "that [Bella was] toward the front of the yard

near the fence by the sidewalk" when she saw Bella's body). While Officer Devine testified that

he believed that Bella posed a risk of serious injury to him, *id.*, Devine Dep. at 75:6-13, he did

not believe Bella was going to kill him, Pl. Opp., Devine Dep. at 74:22-75:4. Officer Devine had

a taser but believed his firearm would be more effective and easier to deploy. *Id.* at 110:1-6,

113:5-16. Officer Devine also did not draw his baton, attempt to command Bella, or climb over

the fence. *Id.* at 73:25-74:10, 75:23-25.

To counter the Officer Defendants' description of their interactions with the Myers' dogs,

and given the lack of any other eyewitnesses other than Mr. Myers, Ms. Myers asserts that Bella

was a "very laid back, happy dog, and just lovable all around." *Id.*, Myers 2022 Dep. at 55:19-20.

Ms. Myers and Ms. Brown testified at their depositions that they never saw Bella act

aggressively toward either of the other dogs in the home. *Id.* at 63:9-64:19; *id.*, Brown 2022 Dep.

at 54:14-55:7. Ms. Myers did testify, however, that the three dogs once killed a stray cat in the

yard. Reply, Ex. 7 ("Myers 2022 Dep.") at 71:9-21. There is also conflicting testimony regarding

whether Bella got along with the Myers' neighbors. *Compare* Mot., Brown 2022 Dep. at 43:10-

12 (stating that Bella got along "great" with the neighbors) *with* Pl. Opp., Myers 2022 Dep. at

79:6-7 (stating that Bella did not get along with the neighbors). Ms. Myers testified, however,

that Bella could walk without a leash "because she would stay right next to [Mr. Myers] and

listen to his commands[.]" Pl. Opp., Myers 2022 Dep. at 65:7-11. Ms. Myers continued that

while Bella was protective of the family and the house, she would relax around strangers if she

saw the Myerses greet them first. *Id.*, Myers 2022 Dep. at 78:6-19. Ms. Myers testified that Bella

would sometimes bark briefly when strangers approached the house but would quickly regain

composure when her owners commanded her to "calm down." *Id*. Ms. Brown testified that Bella

was "good with strangers" but that she was "timid," so they would have to stay with Bella

around strangers. *Id.*, Brown 2022 Dep. at 63:5-10. Plaintiff presents this testimony as circumstantial evidence that Bella was not aggressive and did not attack Officer Devine.

It turns out the day Bella was killed was not the first time she had been shot by a police officer. Almost exactly a year prior to events of this case, on April 10, 2018, Bella was shot in the leg by an officer of a different law enforcement department, a Cecil County deputy sheriff. Compl., ECF No. 1 at ¶ 30. As noted above, Officers Devine, Saulsbury, and Lasassa were members of the Elkton Police Department. According to Plaintiff, two months before Officer Devine killed Bella, the Cecil County sheriff's department had been served with a complaint in which the Myerses asserted claims arising from that earlier shooting. Pl. Opp. at 9. Plaintiff argues that Officer Devine's killing of Bella was in retaliation for the lawsuit against the Cecil County Sheriff's Department. In support of this theory, Plaintiff points to Officer Devine's testimony that he knew the deputies involved in the 2018 shooting through professional interactions, and knew that one of the officers who was at the Myers' home on the day Bella was shot had previously been a police officer in Elkton. *Id.*, Devine Dep. at 20:19-27:1. She also points to Officer Devine's testimony that, prior to killing Bella, he had known that a dog had been shot by the Cecil County Sheriff's department, a fact he states he learned from pictures Ms. Brown (Ms. Myers' daughter) originally posted on Facebook. *Id.* at 13:19-14:9, 20:8-16. Plaintiff also notes Officer Devine's testimony that he was familiar with Ms. Myers' son, Sean Brown, from trespassing and domestic violence reports, but he did not know whether Sean Brown lived at the Myers' house. *Id.* at 29:8-30:15; 37:1-38:9.

On April 4, 2022, Ms. Myers, along with her (now-late) husband James Myers, filed this lawsuit against the Town of Elkton, Maryland, as well as against Officers Devine, Saulsbury, and Lasassa, in their individual and official capacities. Compl., ECF No. 1. They asserted ten counts:

(I) unlawful seizure of property in violation of the Fourth Amendment against Officer Devine and Elkton; (II) unlawful deprivation of private property by law enforcement officers in violation of plaintiffs' Fourteenth Amendment substantive due process right against Officer Devine and Elkton; (III) unlawful seizure of property in violation of Article 24 of the Maryland Declaration of Rights against Officer Devine and Elkton; (IV) conversion against Officer Devine and Elkton; (V) unlawful trespass in violation of the Fourth Amendment against the three officers and Elkton; (VI) illegal entry of property in violation of Article 24 of the Maryland Declaration of Rights against the three officers and Elkton; (VII) trespass to property against the three officers and Elkton; (VIII) intentional infliction of emotional distress against the three officers and Elkton; (IX) negligence against the three officers and Elkton; and, (X) gross negligence against the three officers. *Id.*

Defendants moved to dismiss, and on February 24, 2023, the Court (Judge Gesner) granted the motions in part and denied them in part. ECF No. 52. The Court dismissed all claims against Officer Lasassa, dismissed Counts VIII, IX, and X against Officer Saulsbury, and dismissed Count II against Officer Devine. *Id.* The Court also dismissed Counts I, II, IV, V, VII, VIII, and IX against the Town of Elkton. *Id.*

After discovery, Defendants filed their pending motions for summary judgment on the remaining claims, ECF Nos. 65 & 66, Plaintiff filed a response, ECF No. 70, and Defendants filed replies, ECF Nos. 71 & 74. The counts remaining against the Defendants are: (1) Counts I, III, IV, V, VI, VII, VIII, IX, and X against Officer Devine, (2) Counts V, VI, and VII against Officer Saulsbury, and (3) Counts III and VI against defendant Town. These claims may be grouped into three categories:

(1) the federal and state claims asserting that the officers' entry into the Myers' yard constituted an unconstitutional *search*: Counts V (Fourth Amendment Trespass) and VI (Illegal Entry under Article 24 of the Maryland Declaration of rights);

(2) the federal and state constitutional *seizure* claims: Counts I (Fourth Amendment Seizure) and III (Unlawful Seizure under Article 24 of the Maryland Declaration of Rights); and

(3) the state law claims: Counts VII (Trespass to Property), IV (Conversion), Counts VIII (Intentional Infliction of Emotional Distress), IX (Negligence), and X (Gross Negligence).

In their motions, Defendants contend there is no genuine dispute of material fact, and that Plaintiff has not proffered evidence from which a jury could find for Plaintiff on any of her claims. Defendants also seek immunity from the relevant counts: pursuant to qualified immunity as to the Fourth Amendment claims, and statutory and common-law public official immunity as to the state law claims.

## II.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, a party may move for summary judgment on a "claim or defense—or the part of [any] claim or defense"—by showing that "there is no genuine dispute as to any material fact" and that the moving party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if proof of its existence "might affect the outcome of the suit," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[C]ourts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations." *Sedar*, 988 F.3d at 761 (quoting *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a moving party carries this

burden, then the Court will award summary judgment unless the non-moving party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). The "mere existence of a scintilla of evidence in support of the [opposing party's] position," however, is insufficient to defeat a motion for summary judgment. *Anderson*, 477 U.S. at 252.

## III.    DISCUSSION

As discussed above, Plaintiff has alleged that Defendants violated her and Mr. Myers' rights, under federal and state law, by allegedly trespassing on Plaintiff's property, and by shooting Bella. The Court first analyzes Plaintiff's claims that when Officer Devine entered the Myers' yard and began approaching the home, he conducted an unconstitutional search of the curtilage of the home. The Court then proceeds to analyze Plaintiff's claims that shooting Bella constituted an unlawful seizure under federal and state law, followed by Plaintiff's other state-law claims. For the reasons set forth below, Defendants' motion for summary judgment will be granted in part and denied in part.

### A.    Plaintiff's Fourth Amendment/Article 24 Search/Trespass Claims

Plaintiff's first set of constitutional claims is that Officer Devine and Officer Saulsbury violated the Myers' constitutional rights when they opened the gate to the Myers' yard and began approaching the home. As discussed above, they never got closer to the home than about seven to ten feet; that was when Mr. Myers opened the front door and the dogs ran out. As explained below, these claims present three questions: (1) Did Defendants enter the curtilage of the Myers' home, thereby effecting a search by entering a "constitutionally protected area," *United States v. Jardines*, 569 U.S. 1, 5 (2013)? (2) If so, were they permitted to do so, by virtue of an implied license to approach the home and knock on the door to see if anyone was home, known as the

10

knock-and-talk exception to the Fourth Amendment? (3) In any event, insofar as the Myerses, by

posting a "No trespassing" sign on the front gate or otherwise, had revoked any implied license

of entry that would otherwise have permitted the officers (or any other visitor) to enter the gate

and approach the home, was their right to prevent Defendants from entering their yard

sufficiently clearly established to vitiate the Officer Defendants' qualified immunity?

### 1. Did the Officers' entry into the yard constitute a search?

One way a "search" occurs within the meaning of the Fourth Amendment is where there

has been an invasion of a "reasonable expectation of privacy" in the sense protected by *Katz v.*

*United States*, 389 U.S. 347 (1967), and its progeny.[5] But a physical invasion of a

"constitutionally protected area" can also constitute a "search" for Fourth Amendment purposes,

even in the absence of an invasion of privacy in *Katz* sense. The Supreme Court explained this in

*Florida v. Jardines*:

> When "the Government obtains information by physically
> intruding" on persons, houses, papers, or effects, "a 'search' within
> the original meaning of the Fourth Amendment" has "undoubtedly
> occurred." *United States v. Jones*, 565 U.S. 400, 406 n. 3 (2012). By
> reason of our decision in *Katz v. United States*, 389 U.S. 347 (1967),
> property rights "are not the sole measure of Fourth Amendment
> violations," *Soldal v. Cook County*, 506 U.S. 56, 64 (1992)—but
> though *Katz* may add to the baseline, it does not subtract anything
> from the Amendment's protections "when the Government does
> engage in [a] physical intrusion of a constitutionally protected area,"
> *United States v. Knotts*, 460 U.S. 276, 286 (1983) (Brennan, J.,
> concurring in the judgment).

569 U.S. 1, 5 (2013). Thus, where there has been a "physical intrusion of a constitutionally

protected area," a "search" has occurred, regardless of whether that intrusion also entailed access

---

[5] Article 24 of the Maryland Declaration of Rights is interpreted *in pari materia* with the Fourth
Amendment. *See, e.g.*, *Littleton v. Swonger*, 502 Fed. App'x 271, 274 (4th Cir. 2019). Thus, the
Court analyzes Plaintiff's Counts V and VI together.

to or disclosure of information that a person has kept private. *Id. See also United States v. Chatrie*, 107 F.4th 319, 326, 326 (4th Cir. 2024) (explaining that "[*Katz*'s] privacy-based approach augments the prior trespass-based approach by providing another way to identify a Fourth Amendment search").

Whether a particular area is "constitutionally protected" does not necessarily align with property boundaries. Unlike with respect to state trespass law, under which a trespass occurs upon any "intentional or negligent intrusion upon or to the possessory interest in property of another," *Litz v. Maryland Dep't of Env't*, 131 A.3d 923, 936 (Md. 2016) (internal quotation marks and citation omitted), a Fourth Amendment "search" in the non-*Katz* physical "trespassory activity" sense, *see Jones*, 565 U.S. at 406 n.3, occurs when law enforcement has entered the "curtilage" of a home. *See, e.g.*, *Collins v. Virginia*, 584 U.S. 586, 594 (2018) ("In physically intruding on the curtilage of Collins' home . . . Officer Rhodes . . . invaded Collins' Fourth Amendment interest in the curtilage of his home."). Whether a particular area constitutes curtilage turns on whether "the area in question should be treated as the home itself," by reference to "four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 300 (1987).

Sometimes it is clear whether a particular area around a home constitutes curtilage. For example, a "front porch is a classic exemplar of an area adjacent to the home and 'to which the activity of home life extends.'" *Id.* at 7 (quoting *Oliver v. United States*, 466 U.S. 170, 182 n.12 (1984)). In contrast, "open fields" are by definition not considered curtilage. *See, e.g.*, *Oliver*,

466 U.S. at 178 ("[A]n individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home.").[6]

Here, the evidence in the record, with all inferences drawn in Plaintiff's favor (as they must be at the summary judgment stage), reflects that when the officers arrived at the home, the Myers' front gate was closed and latched; there was a sign on the gate that read "Beware of Guard Dog," "No trespassing," and "Caution"; and Mr. Hindman had warned the officers not to knock on the door but to instead shake the gate and wait for someone to come out. Pl. Opp., Hindman Dep. at 16:4-18. Upon arrival at the property, Officer Devine entered the gate first, and approached within ten feet of the home, with Officer Saulsbury some short distance behind him, before the dogs ran out the front door.

As discussed above, whether some or all of the Myers' yard constitutes curtilage, *i.e.*, a "constitutionally protected area," depends on the four factors set forth in *Dunn*: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." 480 U.S. at 300. While the parties do not dispute that the Myers' front yard is curtilage, those factors point in conflicting directions as applied here. On one hand, for example, the Myers' yard was "included within an enclosure surrounding the home" (the fence), and by the time Officer Devine was within ten feet of the home, that was within "proximity . . . to the home." *Id*. On the other hand, the evidence does not reflect any "steps . . . to protect the area from *observation* by people passing by." *Id*.

---

[6] Although some state courts have rejected the curtilage-vs.-open-fields distinction in interpreting state constitutional provisions, *see, e.g.*, *People v. Scott*, 79 N.Y.2d 474, 478, 489-91 (1992), the Maryland Supreme Court has repeatedly found that "that the protections under Article 26 [of the Maryland Declaration of Rights] are coextensive with those under the Fourth Amendment" in the context of searches and seizures. *Washington v. State*, 287 A.3d 301, 336-37 (Md. 2022).

(emphasis added). The Court need not decide, however, whether Officers Devine and/or Saulsbury in fact entered the Myers' curtilage, because as discussed below they are entitled to qualified immunity with respect to Counts V and VI. Rather, the Court will assume without deciding that Officers Devine and Saulsbury did enter a constitutionally protected area, meaning that their entry constituted a search within the meaning of the Fourth Amendment.

### 2.   Was the officers' entry authorized by the Fourth Amendment's knock-and-talk exception?

Entry by law enforcement onto the curtilage of a home, however, does not automatically constitute an *unconstitutional* search. Here, Defendants did not have a warrant, and do not contend that exigent circumstances existed. But they contend they were nonetheless permitted to "approach [the] home and knock, precisely because that is 'no more than any private citizen may do.'" Officer Defs.' Mem. at 15-16 (quoting *Jardines*, 569 U.S. at 8).

Indeed, most homeowners confer on visitors, whether law enforcement or otherwise, an "implicit license . . . to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 69 U.S. at 8. The existence and scope of such a license "may be implied from the habits of the country." *Id.* (quoting *McKee v. Gratz*, 260 U.S. 127, 136 (1922)). A "knocker on the front door," for example, is generally "treated as an invitation or license to attempt an entry," thereby justifying entry onto the curtilage of a home, including "by solicitors, hawkers, and peddlers of all kinds." *Id.* (quoting *Beard v. Alexandria*, 341 US. 622, 626 (1951)). The Supreme Court has held that if such an implied license extends to *non*-law-enforcement visitors, such as "Girl Scouts and trick-or-treaters," it necessarily extends to law enforcement officers as well. *Id.* "[A] police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.'" *Id.* (quoting *Kentucky v. King*, 563 U.S. 452, 469 (2011)).

This implied right of entry onto the curtilage of a home is sometimes referred to as the "knock-and-talk exception to the Fourth Amendment's warrant requirement." *Covey v. Assessor of Ohio Cnty.*, 777 F.3d 186, 192 (4th Cir. 2015). "Critically . . . the right to knock and talk does not entail a right to conduct a general investigation on a home's curtilage." *Id.* (citing *Rogers v. Pendleton*, 249 F.3d 279, 287 (4th Cir. 2001)). Instead, the scope of the exception is limited to the rationale underlying it: a limited authorization to enter the property, approach the home (ordinarily by a front path[7]), to "knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Jardines*, 69 U.S. at 8.

But not *all* curtilage is necessarily subject to "an implicit license . . . to approach," as the Supreme Court put it in *Jardines*, 69 U.S. at 8. While there is no precedential Fourth Circuit law on point, it is likely that in some circumstances a homeowner can make clear that no such license exists for *that* person's property. For example, an unpublished Fourth Circuit decision that predates Federal Rule of Appellate Procedure 32.1 (and thus is non-precedential and its citation is disfavored under Local Federal Rule of Appellate Procedure 32.1) provides that "if the owner of a home encloses the curtilage with a fence, locks the gate, and posts 'No Trespassing' signs, the effect for Fourth Amendment purposes is to extend the walls of the home to the edge of the curtilage." *Edens v. Kennedy*, 112 F. App'x 870, 875 (4th Cir. 2004). In such circumstances, "the act of sealing the property creates an elevated expectation of privacy." *Id.* (citing *California v. Ciraolo*, 476 U.S. 207, 2011 (1986)).

---

[7] *Compare Alvarez v. Montgomery County*, 147 F.3d 354, 358-59 (4th Cir. 1998) (pre-*Jardines* case holding that officers were authorized to enter a back yard where a sign out front read "Party In Back"), *with Watson v. Pearson*, 928 F.3d 507, 512-13 (6th Cir. 2019) (holding that *Jardines* "clearly rejected" the notion that officers may "proceed around a house and knock on the back door if they have reason to believe that an individual is inside the house and no one answered the front door").

What precedent does establish, however, is that whether an implied license to enter curtilage exists—and the scope of that license—can become a fact-intensive inquiry. For example, in *Rogers*, 249 F.3d 279, an officer who had received a noise complaint approached the plaintiff's home, where he was holding a party to celebrate his daughter's college acceptance. The plaintiff greeted the officer on the driveway, explained he was the homeowner, and made clear he did not consent to a search of the property. "At that point," the justification for the officer's entry onto the property ended, and thus he "no longer had a legitimate reason unconnected with a search of the premises" to remain on the property. *Id.* at 288. Although a pre-*Jardines* case, the Fourth Circuit there applied the same analysis the Supreme Court later applied in *Jardines*. *See, e.g.*, *id.* at 289 ("[T]he right secured by [*United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991)] and similar cases is the right to 'knock and talk,' that is, to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants, not the right to make a general investigation in the curtilage based on reasonable suspicion.").

Against that backdrop, the question is this: Would reasonable officers in Defendants' positions, having arrived at the Myers' gate, have considered themselves impliedly licensed to open the gate and walk toward the front door, to knock on it to see if anyone was home? Or as the *Jardines* Court put it, even assuming Defendants entered a "constitutionally protected area," did Defendants' entry constitute "an *unlicensed* physical intrusion," *see* 569 U.S. at 7 (emphasis added)?[8]

---

[8] The Officer Defendants try to simplify the analysis, arguing, "They were on official business; thus, their entry was justified." Officer Defs.' Mem. at 16. But that is not remotely the *Jardines* standard, which turns on whether the homeowner or resident has impliedly licensed visitors to approach. *See Jardines*, 569 U.S. at 10 ("[T]he question before the court is precisely whether the officer's conduct was an objectively reasonable search. As we have described, that depends upon whether the officers had an implied license to enter the porch, which in turn depends upon the

As with respect to the question of whether the officers entered the Myers' curtilage, the evidence is in conflict as to whether visitors to the Myers' home were impliedly licensed to enter the curtilage, approach the home, and knock on the door. On one hand, Plaintiff does not dispute that, as a general matter, law enforcement officers are permitted to enter private property (including curtilage) in order to approach a home and knock on the door to see if anyone is home. The Myers' home was not surrounded, for example, by a tall opaque fence that would have "seal[ed] the property in such a way that it creates an expectation of privacy" over the entire yard. Officer Defs.' Mem. at 16 (citing *Edens*, 112 F. App'x at 875). And unlike in *Edens*, the gate was latched, not locked. On the other hand, however, as Plaintiff puts it, the home was "fully surrounded by a chain-link fence and . . . there [was] a 'No Trespassing; Beware of Guard Dog' sign on the entrance to that fence." Pl. Opp. at 34. Thus, Plaintiff argues, the Myers' "reasonable expectation of privacy with regards to their home extends to that fence because the fence constitutes the boundary of the curtilage of the home," *id.*, and so by opening the gate, stepping into the yard, and approaching the home, Officers Devine and Saulsbury engaged in an unauthorized, and thus unconstitutional, trespass onto (*i.e.* search of) a constitutionally protected area.

---

purpose for which they entered. Here, their behavior objectively reveals a purpose to conduct a search, which is not what anyone would think he had license to do."). Moreover, precedent makes clear that Defendants' *motivations* for being at the home, or for entering, are irrelevant to whether Defendants were impliedly licensed to open the Myers' gate, enter their front yard, and begin walking up to their front door. *See, e.g., Graham v. Connor*, 490 U.S. 386, 397 (1989) ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional."); *Altman v. City of High Point, N.C.*, 330 F.3d 194, 205 (4th Cir. 2003) (holding that, regarding a warrantless seizure, "[t]he reasonableness calculus is objective in nature; it does not turn upon the subjective intent of the officer").

But just as the Court assumes without deciding that Officers Devine and Saulsbury entered the Myers' curtilage, the Court need not and does not decide whether Defendants were impliedly authorized, pursuant to the knock-and-talk exception, to enter the curtilage around the Myers' home. That is because, as discussed below, regardless of whether Officers Devine and Saulsbury were *in fact* impliedly authorized to enter the yard (including whether portions of it may have constituted curtilage) and approach the house, the Court is constrained to conclude that Defendants would be entitled to qualified immunity on these claims.

### 3.   Qualified immunity as to Plaintiff's search/trespass claims

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When assessing whether an official is entitled to qualified immunity, a court must determine "whether the facts that a plaintiff has . . .  shown . . . make out a violation of a constitutional right" and, if so, "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). A court may start with either inquiry. *Id.* at 236. "[Q]ualified immunity is an affirmative defense, and the burden of pleading it 'rests with the defendant.'" *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 305 (4th Cir. 2006) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231.

"The operation of [the qualified immunity] standard . . . depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). A constitutional right is clearly established when "its contours [are] sufficiently clear that a reasonable official would understand that what [the official] is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). "[T]he very action in question" need not have "previously been held unlawful"; after all, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741; *see also id.* at 739 (rejecting approach that would require, for a right to be clearly established, "the very action in question ha[ve] previously been held unlawful") (cleaned up). But for a right to have been clearly established, "in light of pre-existing law" and in "the circumstances with which [the officer] was confronted" the "the unlawfulness [of the conduct at issue must] be apparent." *Anderson*, 483 U.S. at 640. In other words, an officer alleged to have violated a plaintiff's constitutional rights can only be held liable where, based on the "facts that were knowable to the defendant officers" at the time, *see White v. Pauly*, 580 U.S. 73, 77 (2017)—*i.e.*, "with reference to the particular facts of the case," *Atkinson v. Godfrey*, 100 F.4th 498, 506 (4th Cir. 2024)—the officer had "fair warning" that the conduct at issue 'was unconstitutional." *Hope*, 536 U.S. at 741; *see also Mullenix v. Luna*, 577 U.S. 7, 12 ("The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'") (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)); *King v. Riley*, 76 F.4th 259, 265 (4th Cir. 2023) ("While [the clearly established right] standard does not require 'a case directly on point,' the case law must be 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'") (quoting *Taylor v. Barkes*, 575 U.S. 822, 825 (2015)).

The undisputed evidence pertinent to these claims, and the relevant disputed evidence construed in Plaintiff's favor, is that the Defendant Officers approached the property, saw that the yard was enclosed by a chain-link fence, saw the "Beware of Dog"/"No Trespassing" sign, and were aware of Mr. Hindman's warning not to "knock on the door" but instead to "just shake the fence" so the "dogs will hear it" and then "somebody's going to come outside." The Defendant Officers then had to make a decision whether to open the gate and walk up the roughly 25-foot path to the front door, or to remain outside the gate and find some other way to call out the residents to see if anyone was home, such as by shaking the gate as Mr. Hindman had advised. Officers Devine and Saulsbury decided to disregard Mr. Hindman's advice, and instead to open the gate, enter the yard, and approach the home.

As explained above, "[a]n officer conducting a search is entitled to qualified immunity where clearly established law does not show that the search violated the Fourth Amendment." *Pearson*, 555 U.S. at 243-44. "This inquiry turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Id.* at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)). Thus, the question for qualified immunity purposes as to Plaintiff's constitutional search claims is this: would a reasonable officer in these or similar circumstances have known that the knock-and-talk exception did not apply to the Myers' property, such that the law clearly established that entering the Myers' yard would constitute an unconstitutional search?

The answer is no. For starters, the Supreme Court in *Jardines* made clear in 2013, six years before the events at issue here, that "typically" at least, visitors to a home have an "implicit license . . . to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." 569 U.S. at 8. Although that reference

specifically envisioned a situation where the home at issue had a "knocker on the front door," *id.* (quoting *Beard v. Alexandria*, 341 U.S. 622, 626 (1951)), the reasoning was not limited to that specific circumstance. Moreover, "[c]omplying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters." *Id.*

Both parties argue that *Edens*, an unpublished Fourth Circuit case from 2004, supports their views that the Officer Defendants' actions either did or did not violate clearly established law. *Edens* concerned a rural property that was surrounded by a fence on three sides, and a "densely wooded" lot on the fourth side. 112 F. App'x at 872. Where the fence crossed a driveway, there was a gate that was "kept locked," and was locked on the day at issue. *Id.* at 872-73. The issue in *Edens* was whether an officer could constitutionally enter the property for a "knock-and-talk." *Id.* at 875 ("We hold . . . that if the owner of a home encloses the curtilage with a fence, locks the gate, and posts 'No Trespassing' signs, the effect for Fourth Amendment purposes is to extend the walls of the home to the edge of the curtilage.").

While *Edens* is on point, it is also both unpublished and predates Federal Rule of Appellate Procedure 32.1's relaxation of the use of unpublished opinions. Thus, it cannot be considered in determining whether a constitutional right was clearly established. *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 542-43 (4th Cir. 2017) (explaining that because "unpublished opinions 'are not even regarded as binding precedent in our circuit,' as this Court sitting en banc has explained, they 'cannot be considered in deciding whether particular conduct violated clearly established law for purposes of adjudging entitlement to qualified immunity'") (quoting *Hogan v. Carter*, 85 F.3d 1113, 1118 (4th Cir. 1996) (*en banc*)).

The parties cite no other relevant United States Supreme Court, Maryland Supreme Court, or Fourth Circuit precedent, and this Court has found none, describing what conditions clearly indicate that an individual has revoked "an implicit license . . . to approach" a private dwelling in connection with a constitutional claim. *Jardines*, 69 U.S. at 8. Given the longstanding right to knock and talk, and the lack of clearly established limitations that would have led reasonable officers to believe they were prohibited from opening the Myers' (unlocked) gate and approaching the front door, the Court concludes that even with all reasonable factual inferences from the record drawn in Plaintiff's favor, the Officer Defendants' actions did not violate clearly established law and they are entitled to qualified immunity on these claims. *See Jardines*, 569 U.S. at 8; *Covey*, 777 F.3d at 192-93; *Rogers*, 249 F.3d at 294.

For these reasons, Defendants are entitled to summary judgment on Plaintiff's search-related constitutional claims, namely Count V against Officers Devine and Salsbury, and Count VI against Officers Devine and Saulsbury and the Town of Elkton.

### B. Plaintiff's Fourth Amendment/Article 24 Seizure Claims

#### 1. The merits of Plaintiff's seizure claims

Plaintiff's next set of claims allege that by killing Bella, Officer Devine seized Plaintiff's property in violation of the Fourth Amendment and Article 24. "[P]rivately owned dogs [are] 'effects' subject to the protections of the Fourth Amendment," and the killing of a dog by a police officer constitutes a seizure of the dog owner's property. *Altman*, 330 F.3d at 203-05. Thus, an officer's killing of an owned dog is analyzed through the reasonableness standard of the Fourth Amendment, under which "a court must 'balance the nature and quality of the intrusion on the individual's Fourth Amendment interest against the importance of the governmental interests alleged to justify the intrusion.'" *Id.* at 205 (quoting *United States v. Place*, 462 U.S.

22

696, 703 (1983)). "A seizure of personal property conducted without a warrant is presumptively

unreasonable." *Id.* (citing *Place*, 462 U.S. at 701). In performing the reasonableness analysis, a

fact finder must assess "whether the officers' actions are 'objectively reasonable' in light of the

facts and circumstances confronting them, without regard to [the officers'] underlying intent or

motivation." *Graham*, 490 U.S. at 397.

Here, the undisputed evidence establishes that the intrusion was severe. The Fourth

Circuit has repeatedly acknowledged the significant interest owners have in their pets. *See, e.g.*,

*Altman*, 330 F.3d at 205 ("Dogs have aptly been labeled 'Man's Best Friend,' and certainly the

bond between a dog owner and his pet can be strong and enduring. Many consider dogs to be

their most prized personal possessions, and still others think of dogs solely in terms of an

emotional relationship, rather than a property relationship."); *Ray v. Roane*, 948 F.3d 222, 227

(4th Cir. 2020) ("*Ray I*") ("[P]rivate interests in dogs—and family pets especially—are highly

significant.").

The governmental interests alleged to justify the seizure—protecting individuals,

including law enforcement officers, from imminent danger of physical harm—is also strong. *See*

*id.* ("[T]he government undoubtedly has a strong public interest in protecting citizens and

officers from dogs that may be dangerous or otherwise a source of public nuisance."). But those

government interests will only overcome the presumptive unreasonableness of the seizure in the

context of summary judgment if there is no genuine dispute as to the existence and degree of that

danger. "[T]he use of deadly force against a household pet is reasonable only if the pet poses an

immediate danger and the use of force is unavoidable." *Ray v. Roane*, 93 F.4th 651, 654 (4th Cir.

2024) ("*Ray II*") (quoting *Ray I*, 948 F.3d at 230). Here, the only direct evidence, which comes

from the officers' depositions and affidavits, indicates that Bella was an immediate danger. At

this stage, however, it is appropriate for the Court to consider the circumstantial evidence that Bella was a friendly, well-behaved dog who would not attack a person. *See Strong v. Perrone*, No. 17-CV-6183-FPG, 2020 WL 1445877, at *5 (W.D.N.Y. Mar. 25, 2020) (finding the dog's "general temperament" relevant to the Fourth Amendment seizure analysis and citing cases); *id.* at *4 ("As the only direct witness of [the dog's] behavior in the moments before he shot her, [the officer's] credibility is very important. Courts may not make credibility determinations in ruling on a motion for summary judgment."); *see also Ray II*, 93 F.4th at 656–57 (providing that "a jury would not be required to accept [the officer's] account of his own perceptions without question"); *Stanton v. Elliott*, 25 F.4th 227, 234 (4th Cir. 2022) (cautioning against "simply accepting officer testimony as true").

As described above, there is evidence that Bella was a friendly, non-aggressive dog who was well trained and might bark at strangers but would calm down with instruction from her owners. Pl. Opp., Myers 2022 Dep. at 55:19-20, 63:5-64:19, 65:7-11, 78:6-19; *id.*, Brown 2022 Dep. at 54:14-55:7. There are also disputes of fact related to the reasonableness of Officer Devine's reaction, including whether it would have been more reasonable to use his taser, his baton, audible commands, or to climb over the fence. Of course, "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Altman*, 330 F.3d at 205 (quoting *Graham*, 490 U.S. at 396-97). Thus, at least for qualified immunity purposes, courts must permit "breathing room" for officers to "make reasonable but mistaken judgments." *Ray II*, 948 F.3d at 229. But here, the factual record, when viewed in the light most favorable to Plaintiff, is simply too contested to resolve at the summary judgment stage whether, for example, Bella was aggressive and attacked Officer Devine, whether Officer Devine was in

imminent danger, and whether Officer Devine could have climbed the fence or deployed an alternative to his firearm. *See Wood v. Stotski*, 129 A. 646, 647 (Md. 1925) ("[T]he question whether, in a particular case, there was such imminent danger, making it reasonable to kill the dogs, is almost always one for the jury."). Those factual disputes must be resolved by a jury before a determination can be made on "whether the totality of the circumstances justified" Officer Devine's shooting of Bella. *See Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985); *see also Armstrong v. Hutcheson*, 80 F.4th 508, 514, 515 (4th Cir. 2023) (stating that although "disputes over historical facts can be material" and thus preclude summary judgment, the "ultimate question of the conduct's reasonableness"—*i.e.*, "whether a constitutional violation has occurred"—is "not a jury question" but rather "is a question for the court").

### 2.    Qualified immunity as to Plaintiff's seizure claims

As with Plaintiff's search claims, the Court must determine not only "whether the facts that a plaintiff has  . . .  shown . . . make out a violation of a constitutional right," but also "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson*, 555 U.S. at 232 (2009). Unlike the search claims, however, the Court concludes that the same historical factual disputes described above preclude a determination at this stage as to whether Officer Devine is entitled to qualified immunity. As discussed above, whether Officer Devine violated a constitutional right depends on resolution of contested material. *See Ray I*, 948 F.3d at 228 ("The question of whether a reasonable officer would have known that the conduct at issue violated that right, however, cannot be decided prior to trial if disputes of the facts exist.").

And with respect to the question of whether Officer Devine violated a clearly established right, it is well-settled that officers cannot take unreasonable measures in effectuating a seizure

of a pet on its owner's fenced-in property, or kill a pet that does not pose an immediate danger. *See id.* (providing that it would be "unreasonable for a police officer to shoot a privately owned animal when it does not pose an immediate threat to the officer or others"); *Brown v. Muhlenberg Twp.*, 269 F.3d 205, 211-12 (3d Cir. 2001) (holding that an officer would not be entitled to qualified immunity if the officer killed "a pet who posed no imminent danger and whose owners were known, available, and desirous of assuming custody").[9] It is equally established, however, that an officer may kill a dog who is an immediate threat without violating a constitutional right. *See Ray II*, 93 F.4th at 654 ("[T]he use of deadly force against a household pet is reasonable only if the pet poses an immediate danger and the use of force is unavoidable.") (quoting *Ray I*, 948 F.3d at 230); *Brown*, 269 F.3d at 210-11 (providing that "the state's interest in protecting life and property may be implicated when there is reason to believe the pet poses an imminent danger," which "may even justify . . . the destruction of the pet in the owner's presence").

Here, determining which of those rules controls requires knowing, for example, whether Bella in fact presented an "imminent danger" to Officer Devine as well as whether, even if she presented an immediate danger, "the use of force [was] unavoidable." *See Ray II*, 93 F.4th at 654. There is sufficient evidence in the record from which a reasonable jury could go either way on those factual disputes. The Court cannot decide the ultimate issue of qualified immunity until the jury resolves the genuine disputes regarding the historical facts described above. As a result, the Court will deny Defendants' motion as to the constitutional seizure claims.

---

[9] As stated above, despite Plaintiff's argument to the contrary, the officers' "underlying intent or motivation" does not factor into whether there was a constitutional violation. *Graham*, 490 U.S. at 397; *Altman*, 330 F.3d at 205. Thus, the Court does not consider Plaintiff's theory that the officers were at the Myers' house for a malicious purpose in connection with these claims.

C.      **Plaintiff's Other State Law Claims**

Finally, Plaintiff asserts five non-constitutional state law claims: Count IV (Conversion Against Officer Devine), Count VII (Trespass to Property Against Officers Devine and Saulsbury), Count VIII (Intentional Infliction of Emotional Distress Against Officer Devine); Count IX (Negligence Against Officer Devine); and Count X (Gross Negligence Against Officer Devine). As to these claims, Defendants assert that they have common law and statutory public officer immunity and, thus, summary judgment should be granted in their favor. Defendants do not otherwise argue the merits of these claims (other than as to Plaintiff's gross negligence and trespass claims, which will be addressed separately below).

1.      **State law immunity**

"An official of a municipal corporation while acting in a discretionary capacity, without malice, and within the scope of the official's employment or authority shall be immune as an official or individual from any civil liability for the performance of the action." Md. Code Ann., Cts. & Jud. Proc. § 5-507(a)(1). The purpose of Section 5-507 "was to codify existing public official immunity, and not to extend the scope of qualified immunity beyond its Maryland common law boundaries." *Lovelace v. Anderson*, 785 A.2d 726, 734 (Md. 2001) (quoting *Ashton v. Brown*, 339 Md. 70, 116, 660 A.2d 447, 470 n.23 (1995)). Under the common law, public officials are entitled to immunity from "tort claim[s] based upon alleged mis-judgment or a negligent exercise of judgment." *Lee v. Cline*, 863 A.2d 297, 307 (Md. 2004). Public official immunity is not available for malicious or intentional acts, *DiPino v. Davis*, 729 A.2d 354, 370 (Md. 1999), or for grossly negligent acts, *Cooper v. Rodriguez*, 118 A.3d 829, 860 (Md. 2015). Thus, unlike the constitutional claims discussed above, whether an official is entitled to immunity under § 5-507 generally "requires a determination of whether the arresting officer's

'conduct, given all of the existing and antecedent circumstances, was motivated by ill will, [or] by an improper motive.'" *Thacker v. City of Hyattsville*, 762 A.2d 172, 189 (Md. App. 2000) (quoting *Shoemaker v. Smith*, 725 A.2d 549, 560 (Md. 1999)). "[T]hat motive or animus may exist even when the conduct is objectively reasonable." *Id.* "Malice can be established by proof that the officer 'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate, the purpose being to deliberately and willfully injure the plaintiff.'" *Id.* (quoting *Shoemaker*, 725 A.2d at 560).

The Officer Defendants assert their actions fall within the scope of the immunity described above because there is no evidence of malice. Drawing all reasonable inferences in Plaintiff's favor, however, the Court finds there are genuine disputes as to material facts regarding whether the officers acted with malice. Specifically, there is circumstantial evidence that the officers went to the Myers' house with ill intentions, namely in retaliation for the lawsuit against the Cecil County Sheriff's department. While the officers' motivations were immaterial for the constitutional analyses, they are key to the question of whether they are entitled to immunity from the remaining state law claims. Although a trial may establish facts that would render the officers' conduct protected by § 5-507, the record precludes the Court from granting summary judgment based on public official immunity.

Defendants also argue that Section 13-105 of the Local Government Article of the Maryland Code provides that "a person may kill a dog that the person sees in the act of . . . attacking a human being" and that the person "is immune from any civil liability or criminal penalty for the killing." Md. Code Ann., Local Gov't § 13-105. But there are genuine disputes

regarding whether Bella attacked Officer Devine. Thus, the Court cannot grant summary judgment on this ground either.[10]

### 2.    Gross Negligence

Regarding the claim of gross negligence, to which public official immunity does not apply, *Cooper*, 118 A.3d at 860, Defendants argue that because Officer Devine was in fear of serious bodily injury, killing Bella was reasonable and not reckless, and thus no reasonable factfinder could find for Plaintiff on her gross negligence claim. Gross negligence is "something *more* than simple negligence, and likely more akin to reckless conduct." *Barbre v. Pope*, 935 A.2d 699, 717 (Md. 2007) (quoting *Taylor v. Harford County Dept of Soc. Servs.*, 862 A.2d 1026, 1035 (Md. 2004)). It is "an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them." *Id.* (quoting *Liscombe v. Potomac Edison Co.*, 495 A.2d 838, 846 (Md. 1985)). Whether gross negligence exists is a fact-intensive inquiry, and "is usually a question for the jury"; it is a question of law "only when reasonable [jurors] could not differ as to the rational conclusion to be reached." *Rodriguez v. State*, 98 A.3d 376, 391 (Md. App. 2014) (quoting *Romanesk v. Rose*, 237 A.2d 12, 14 (Md. 1968)). Here, the jury must decide whether, despite multiple warnings, it was grossly negligent for Officer Devine to enter through the gate and shoot Bella.

---

[10] Defendants also attempt to argue that Bella was not personal property because she was not licensed and, thus, there was no recognizable seizure when she was killed. Section § 13-107(b) of the Local Government Article of the Maryland Code provides that a "lawfully licensed dog . . . is personal property." Md. Code Ann., Local Gov't § 13-107(b). Contrary to Defendants' argument, this statute does not provide that an unlicensed dog is therefore not property. The fact that the Myers did not have a license for her simply means that *that statute* is not what rendered her personal property. Instead, Bella is considered personal property for purposes of Plaintiff's state law claims by virtue of the common law. *Moore v. Myers*, 868 A.2d 954, 965 (Md. App. 2005) ("[D]ogs are chattel under Maryland law.").

### 3.      Trespass

"A common law trespass action is still an available alternative for claims under the

Maryland Constitution." *Ford v. Baltimore City Sheriff's Off.*, 814 A.2d 127, 144 (Md. App.

2002). Thus, a court should "analyze the common law trespass claim along with the

constitutional claims." *Id.* Trespass is "a tort involving an intentional or negligent intrusion

upon" another's property. *E.N. v. T.R.*, 255 A.3d 1, 24 (Md. 2021) (quoting *Mitchell v. Balt. Sun

Co.*, 883 A.2d 1008, 1014 (Md. App. 2005)). One element is "that the plaintiff must establish

nonconsensual interference with" the property. *Id.* Consent can be express or implied. *Id.*

Like with respect to the constitutional claims, homeowners are generally presumed under

Maryland common law to impliedly authorize visitors to walk onto their property to knock on

their door. *McGurk v. State*, 28 A.3d 720, 729-30 (Md. 2011). In determining whether this

consent has been revoked, the case law indicates that courts should look to "the customs of the

community, " *E.N.*, 255 A.3d at 24 (quoting *Mitchell*, 883 A.2d at 1016), as well as "whether the

homeowner has erected any physical barriers, such as gates or fences, across the entrance to the

property," and "whether the homeowner has posted signs, such as 'no trespassing' or 'private

property' signs, indicating a desire to exclude the public from the premises." *McGurk*, 28 A.3d at

731-32 (quoting *Robinson v. Commonwealth*, 625 S.E.2d 651, 658 (Va. App. 2006), *aff'd*, 639

S.E.2d 217 (2007)).

Here, the Myerses erected a fence and posted a "Beware of Guard Dog" sign that also

read "No trespassing" and "Caution." As the Court noted in discussing the constitutional trespass

claims, there are various genuine factual disputes regarding the revocation of implied consent—

and thus regarding whether Plaintiff may make out a common law trespass claim. But unlike

with respect to the constitutional claims, immunity is inappropriate at this time as to Plaintiff's

common law trespass claim given the factual questions regarding the officers' motive for going to the Myers' house. As stated, the Defendants' states of mind did not factor into the constitutional analysis, but they do under Section 5-507. Given the genuine disputes as to material facts, Defendants are not entitled to summary judgment on this trespass claim.

## IV.    CONCLUSION

The Court will grant summary judgment in favor of the Defendants on Count V (Fourth Amendment Trespass) and Count VI (Illegal Entry under Article 24 of the Maryland Declaration of Rights) because the Court concludes that the Officer Defendants have qualified immunity to those claims. The Court will deny summary judgment on the remaining claims. Regarding the federal and state constitutional seizure claims—Count I (Fourth Amendment Seizure) and Count III (Unlawful Seizure under Article 24 of the Maryland Declaration of Rights)—the Court concludes that genuine disputes as to historical material facts remain that inform the reasonableness of Officer Devine's actions and whether he was attacked by Bella. Regarding the remaining state law claims: Count IV (Conversion), Count VII (Trespass to Property), Count VIII (Intentional Infliction of Emotional Distress), Count IX (Negligence), and Count X (Gross Negligence), the Court concludes there are genuine disputes as to material facts regarding the officers' intent in going to the Myers' house and whether Officer Devine was grossly negligent.

A separate order follows.


Date: August 16, 2024                                    _____/s/_____
                                                        Adam B. Abelson
                                                        United States Magistrate Judge